UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

EISENHOWER PROPERTY GROUP,
LLC,

      Plaintiff,

v.                    Case No. 8:21-cv-229-VMC-TGW

HILLSBOROUGH COUNTY,
and HILLSBOROUGH COUNTY
SCHOOL BOARD,

      Defendants.
_____/

**ORDER**

This matter comes before the Court upon consideration of
Defendants Hillsborough County and Hillsborough County School
Board's joint Motion to Dismiss (Doc. # 26), filed on March
19, 2021. Plaintiff Eisenhower Property Group, LLC, responded
on April 9, 2021. (Doc. # 31). For the reasons set forth
below, the Motion is denied.

I.    **Background**

Eisenhower Property is the "developer of [a residential]
tract of real property known as 'Creek Preserve' . . . in
southern Hillsborough County, Florida." (Doc. # 1 at ¶¶ 7,
33). The instant case arises out of the Concurrency
Proportionate Share Development Mitigation Agreement
("Development Agreement") the parties entered into so that

Eisenhower Property could develop the land. (Id. at ¶ 1).

Under Florida law, certain property developers must "pay for a proportionate share of the costs of the expansion of public services" if the "existing public services are inadequate" to support a new development. (Id. at ¶ 16); Fla. Stat. § 163.3180 (2020). This is known as concurrency. (Doc. # 1 at ¶ 15). Relevant to the parties' dispute is school concurrency, which "requires school facilities to be in place concurrently with the impacts of new residential developments." (Id. at ¶ 17). School concurrency may be applied on a districtwide or less than districtwide basis. (Id. at ¶ 18); see also Fla. Stat. § 163.3180(6)(a)(f) (providing that "local governments are encouraged . . . to apply school concurrency to a development on a districtwide basis" but noting standards for applying it on a less than districtwide basis). "School concurrency is satisfied if the developer executes a legally binding commitment to provide mitigation proportionate to the demand for public school facilities to be created by actual development of the property." Id. at § 163.3180(6)(h)(c)(2).

When a developer agrees to make a proportionate share mitigation payment, the local government "typically . . . provide[s] impact fee credits." (Doc. # 1 at ¶ 31). Impact

2

fees "are an important source of revenue for a local government to use in funding the infrastructure necessitated by new growth." Fla. Stat. § 163.31801(2); (Doc. # 1 at ¶ 31). According to Eisenhower Property, credits toward these impact fees "ensure that a local government is not charging a developer twice for the same improvement." (Id. at 9 n.1).

In developing Creek Preserve, which was "approved for 636 single family units," Eisenhower Property was "notified that its project would fail school concurrency tests." (Id. at ¶ 33). Specifically, Defendants determined there would be a deficiency in middle school capacity. (Id. at ¶ 39). Pursuant to the County's "Interlocal Agreement," these concurrency tests were conducted on a less than districtwide basis. (Id. at ¶¶ 20, 28). "[T]he parties [then] agreed to a proportionate share mitigation payment" of $2,037,411 that would go toward "the cost of providing the school facilities necessary to serve the development." (Id. at ¶¶ 25, 37, 40).

"However, the County informed Eisenhower [Property] that [they] refused to allow full impact fee credit for [Eisenhower Property's] proportionate share mitigation payment." (Id. at ¶ 38). Instead, Eisenhower Property would only receive an impact fee credit of $580,265. (Id. at ¶ 40). This represented an impact fee credit for only "the middle school portion of

the development's future impact fee payments." (Id. at ¶ 39).

According to Eisenhower Property, "[t]he County advised that it would approve the Development Agreement only if Eisenhower [Property] signed a document purporting to relinquish [its] right to $1,457,176 in impact fee credits," representing the difference between the $2,037,411 proportionate share mitigation payment and $580,265 impact fee credit. (Id. at ¶ 41). "The School Board agreed with and supported the County's demand." (Id. at ¶ 42). Although Eisenhower disagreed with this demand, "after nearly eighteen months of delays on the Creek Preserve project, which could not move forward without the County's and the School Board's consent to the . . . Development Agreement, Eisenhower [Property] had no choice but to accede to the County's and the School Board's demands and execute the Development Agreement." (Id. at ¶ 44). The parties finalized and signed the Agreement on January 15, 2019. (Id. at ¶ 1).

After "the County approved the final plat for the first phase of Creek Preserve," Eisenhower Property made its proportionate share mitigation payment "under protest." (Id. at ¶ 47). However, about six months after the parties executed the Development Agreement, "[e]ffective June 28, 2019, the Florida Legislature enacted [House Bill] 7103, [which] the

Florida Governor [then] signed into law." (Id. at ¶ 49). That legislation, known as the Impact Fee Credit Clarification, requires that "any contribution, whether identified in a proportionate share agreement or other form of exaction, related to public education . . . be applied to reduce any education-based impact fees on a dollar-for-dollar basis at fair market value." (Id. at ¶ 50); Fla. Stat. § 163.31801(4). Additionally, it provides that these credits "must be based on the total impact fee assessed and not on the impact fee for any particular type of school." (Doc. # 1 at ¶ 51); Fla. Stat. § 163.3180(5)(h)(2)(b). Eisenhower Property contends that the Development Agreement must be modified in accordance with this law, such that they would be awarded the full impact fee credit of $2,037,441. (Doc. # 1 at ¶¶ 54, 61).

Eisenhower Property initiated this action on January 29, 2021. (Doc. # 1). The complaint includes the following claims against both the County and the School Board: violations of 42 U.S.C. § 1983 (Count I), and declaratory relief pursuant to 28 U.S.C. § 2201 (Count II). (Id.).

On March 19, 2021, the County and School Board jointly moved to dismiss the complaint. (Doc. # 26). Eisenhower Property responded on April 9, 2021 (Doc. # 31), and the Motion is now ripe for review.

5

## II.  **Legal Standard**

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court accepts as true all the allegations in the complaint and construes them in the light most favorable to the plaintiff. Jackson v. Bellsouth Telecomms., 372 F.3d 1250, 1262 (11th Cir. 2004). Further, the Court favors the plaintiff with all reasonable inferences from the allegations in the complaint. Stephens v. Dep't of Health & Human Servs., 901 F.2d 1571, 1573 (11th Cir. 1990). But,

> [w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quotations and citations omitted). Courts are not "bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). The Court must limit its consideration to "well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." La Grasta v. First Union Sec., Inc., 358 F.3d 840, 845 (11th Cir. 2004).

III. **Analysis**

The County and School Board jointly move to dismiss the entire complaint on several bases. (Doc. # 26). The Court will address each argument in turn.

A. **Comprehensive Plan and Interlocal Agreement**

First, Defendants argue that Eisenhower Property's claims must be dismissed because they seek relief that "would cause [Eisenhower Property's] development to fail the concurrency analysis, violating the [County's] Comprehensive Plan and Interlocal Agreement." (Doc. # 26 at 8-13). Eisenhower Property responds that modification of the Development Agreement is consistent with the Comprehensive Plan, and that the requested modification "would [actually] bring the Development Agreement into compliance with the current requirements of the Comprehensive Plan and Interlocal Agreement." (Doc. # 31 at 11).

The Court finds Defendants' argument too cursory to support dismissal on this basis. Defendants maintain that this modification of the agreement would cause Eisenhower Property's development to fail concurrency analysis and violate the Comprehensive Plan, but they do not cite to any particular provision of the Comprehensive Plan or Interlocal Agreement that would be violated. (Doc. # 26 at 8-13); <u>see</u>

also <u>Herbert v. Architect of Capitol</u>, 839 F. Supp. 2d 284, 298 (D.D.C. 2012) ("[T]he [defendant] has simply failed to support its argument with any meaningful measure of factual or legal argument. Courts need not consider cursory arguments of this kind, and the Court declines to do so here."). And, at this juncture, the Court cannot say that the requested modification would violate the Comprehensive Plan as a matter of law simply because Eisenhower Property agreed "to pay $2,037,441 as proportionate share mitigation" with a $580,265 impact fee credit. (Doc. # 26 at 12). Nor is the Court certain that this modification would necessarily cause Eisenhower Property's development to fail concurrency analysis.

Further, the Court must base its determination on the facts alleged in the complaint, and so it declines to dismiss the action because Defendants allege that they "already used [the monies] to construct additional school capacity for [Eisenhower Property's] development." (<u>Id.</u> at 12); <u>see</u> <u>Moreno v. Carnival Corp.</u>, 488 F. Supp. 3d 1233, 1236 (S.D. Fla. 2020) ("On a motion to dismiss for failure to state a claim, the Court is generally confined to the four corners of the complaint unless 'the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim.'" (citation omitted)).

Defendants also argue that the requested modification runs afoul of other statutory requirements, such as review by a "local planning agency or a separate land development regulation commission." (Doc. # 26 at 12-13). For this proposition, Defendants cite to the following statute:

> After a comprehensive plan for the area, or element or portion thereof, is adopted by the governing body, no land development regulation, land development code, or amendment thereto shall be adopted by the governing body until such regulation, code, or amendment has been referred either to the local planning agency or to a separate land development regulation commission created pursuant to local ordinance, or to both, for review and recommendation as to the relationship of such proposal to the adopted comprehensive plan, or element or portion thereof. Said recommendation shall be made within a reasonable time, but no later than within 2 months after the time of reference. If a recommendation is not made within the time provided, then the governing body may act on the adoption.

Fla. Stat. § 163.3194(2). But, Eisenhower Property does not appear to seek adoption of a "land development regulation, land development code, or amendment thereto"; rather, it seeks modification of the Development Agreement. (Doc. # 1 at ¶ 54). Accordingly, the Court is not convinced at this juncture that this statute would be invoked if the Court granted the relief Eisenhower Property requests, and it declines to dismiss the complaint for this reason.

## B. <u>District-Wide Concurrency Service Area</u>

Next, Defendants argue that Florida law "requires . . . [them] to implement a school concurrency program" but "gives [them] the option of using a districtwide system or a less-than-districtwide system." (Doc. # 26 at 13). Defendants maintain that they "have met the requirements pursuant to Florida [law] and the Comprehensive Plan" and that their decision to elect a "less-than-districtwide approach does not affect [Eisenhower Property's] obligations under the Development Agreement nor does it warrant a modification of the Development Agreement after the fact." (<u>Id.</u> at 15-16). Additionally, Defendants argue that Eisenhower Property's "assertion that the parties must comply with 2019 substantive revisions to [Florida statutes] which were not in effect at the time of the execution of the Development Agreement, and which are not retroactive, is without merit." (<u>Id.</u> at 16).

As to Defendants' first argument, Eisenhower Property responds that they do "not allege Defendants violated state law by imposing the discouraged system of less-than-districtwide system school concurrency." (Doc. # 31 at 13). Rather, their complaint "merely highlights the stricter standards imposed by state law if such a system is used, and that local governments are afforded less discretion in the

implementation of such systems." (Id.).

The Court agrees that the fact that Defendants had the discretion to implement a less-than-districtwide approach does not warrant dismissal. Eisenhower Property does not move for modification on this basis, but rather because, among other things, Florida law now *explicitly* requires that "Defendants . . . agree to a full dollar-for-dollar impact fee credit for the total amount of [Eisenhower Property's] $2,037,441 proportionate share payment." (Doc. # 1 at ¶ 4).

As to Defendants' argument that the 2019 clarification was not in place when the parties entered into the Development Agreement, and is not retroactive, Eisenhower Property responds that "Florida law expressly anticipates modifications to development agreements 'as is necessary to comply with the relevant state or federal laws' subsequently enacted" and that "even if this Court were to apply the state law in effect at the time of the execution of the Development Agreement, the outcome would be the same – Defendants are required to provide full impact fee credits and their failure to do so results in an unlawful exaction." (Doc. # 31 at 14).

Again, Defendants provide no substantiation for their conclusory argument that the 2019 clarification is not retroactive or that the previous version of the law allowed

such conduct. Indeed, Defendants' argument regarding retroactivity is confined to a single sentence: "The recent state laws cited by [Eisenhower Property] are not retroactive, so there is no need to evaluate the impact of Section 163.3241 to the Development Agreement." (Doc. # 26 at 7). And, the cited 2011 Florida Supreme Court case does not discuss retroactive application of the 2019 clarification. See Fla. Ins. Guar. Ass'n, Inc. v. Devon Neighborhood Ass'n, Inc., 67 So.3d 187, 194 (Fla. 2011) (discussing the test for retroactivity generally). Accordingly, the Court declines to dismiss the complaint for this reason as well. See MSPA Claims 1, LLC v. Covington Specialty Ins. Co., No. 19-21583-Civ-WILLIAMS/TORRES, 2020 WL 5984382, at *7 (S.D. Fla. May 12, 2020) ("[C]onclusory arguments are not sufficient to support [a] motion to dismiss." (citations omitted)).

## C. <u>Proper Forum for Modification or Revocation</u>

Next, Defendants argue that "this Court is not the proper forum for . . . modification [of the Development Agreement] and the School Board has the right to modify [or] revoke the Development Agreement." (Doc. # 26 at 16). Defendants state that if the "Court determine[s] that the Development Agreement must either be modified or revoked . . . [they would] elect to . . . revoke [it]." (<u>Id.</u> at 18-19). Defendants

12

also point to the Agreement's severability clause, which states that following a court's finding that a provision therein is unenforceable, the rest of the Agreement remains in force only if "doing so would not affect the overall purpose or intent of the Agreement." (Id. at 18). Defendants argue that the requested modification would "affect the overall purpose and intent of the [Development Agreement] because the granting of the Certificate of School Concurrency [would] no longer be financially feasible." (Id.). Additionally, Defendants argue that "[b]efore amending or revoking the Development Agreement, the County must conduct at least two public hearings and set forth several specific determinations." (Id. at 17).

Eisenhower Property responds that Defendants "improperly rely on facts outside of the [c]omplaint" in making these arguments. (Doc. # 31 at 15-17). Eisenhower Property also argues that "[a] motion to dismiss is not the proper stage for this Court to make [a] fact-intensive determination regarding [the] equitable remedies" of modification or revocation, "Defendants do not have a right to choose revocation over modification," and "the severability clause . . . expressly provides that invalid or unenforceable provisions should be stricken." (Id.).

Defendants provide no authority for the proposition that because revocation of the Development Agreement is a possible remedy under both the Agreement and Florida law, a complaint seeking modification instead must be dismissed. And, as previously noted, the Court declines to consider facts outside the complaint – namely, that Defendants have already "construct[ed] facilities to serve the developments [Eisenhower Property] sought to build" or that modification is not financially feasible. (Doc. # 26 at 17, 19). Nor have Defendants convinced the Court that modifying the Development Agreement in this way would necessarily "affect the overall purpose and intent of the agreement." (Id. at 18). The Court will be in a better position to determine the parties' intent at summary judgment. See Barnett v. Carnival Corp., No. 06-22521-CIV, 2007 WL 1746900, at *4 (S.D. Fla. June 15, 2007) ("To determine the parties' intent as the defendant suggests necessarily would require the Court to look at matters outside of the complaint. As such, the issue of intent is not appropriate for resolution on a motion to dismiss.").

Finally, Eisenhower Property does not squarely address Defendants' argument that Florida law requires that the local government hold "at least two public hearings" before "amending[] or revoking a development agreement," and that

these public hearings have not yet occurred. (Doc. # 26 at 17 (quoting Fla. Stat. § 163.3225(1))). However, the statute does not state that public hearings are a prerequisite to filing a lawsuit arising out of a Development Agreement in light of subsequently enacted law. And, another provision of the Development Agreement Act allows for certain amendments following changes in law: "If state or federal laws are enacted after the execution of a development agreement which are applicable to and preclude the parties' compliance with the terms of a development agreement, such agreement shall be modified or revoked as is necessary to comply with the relevant state or federal laws." Fla. Stat. § 163.3241. Thus, the Court declines to dismiss the complaint for this reason.

### D. Dual Rational Nexus Test

Next, Defendants argue that Eisenhower Property's "claims of violation of the Fifth and Fourth Amendments fail as a matter of law because the rational nexus for the payment required is evident from the Development Agreement, as well as the Comprehensive Plan and Interlocal Agreement referenced within it." (Doc. # 26 at 19-20). Eisenhower Property responds that "Defendants carry the burden to prove that the exaction of impact fee credits in addition to the proportionate share payment is legitimate – and such determination cannot be made

on a motion to dismiss." (Doc. # 31 at 18 (emphasis omitted)).

The Court declines to determine as a matter of law whether a rational nexus exists at this juncture. See St. Johns Cnty. v. Ne. Fla. Builders Ass'n, Inc., 583 So.2d 635, 638 (Fla. 1991) (noting that the local government bears the burden of "demonstrat[ing] that there is a reasonable connection between the need for additional schools and the growth in population that will accompany new development"); see also Ballinger v. City of Oakland, 398 F. Supp. 3d 560, 572 (N.D. Cal. 2019) (noting that the essential nexus and rough proportionality tests are "fact-intensive"). Again, with the benefit of additional factual development at the summary judgment stage, the Court will be in a better position to analyze whether the rational nexus test has been satisfied. Cf. MCZ/Centrum Flamingo II, LLC v. City of Miami Beach, No. 08-22419-CIV-ALTONAGA/Brown, 2009 WL 10700923, at *9 (S.D. Fla. Mar. 4, 2009) ("Miami Beach raises factual disputes based on matters outside the four-corners of the Complaint and unsupported by the evidence. Miami Beach's conclusory assertions regarding the interests of the government, the impacts of the proposed development, and any public benefits that would be provided . . . are both inappropriate at this juncture and insufficient to support its Motion.").

## E. <u>Negotiation and Full Performance</u>

Finally, Defendants argue that "the parties negotiated and agreed to the terms of the Development Agreement, specifically the proportionate share mitigation fee and impact fee offset. The parties [then] executed the Development Agreement, and . . . performed their obligations." (Doc. # 26 at 23-24). Because of this, Defendants maintain that Eisenhower Property "cannot now seek to modify the terms of the Development Agreement to which it helped create[] and agreed to." (<u>Id.</u> at 24). And, Defendants cite to the Agreement's release clause, which provides:

> <u>**RELEASE**</u>. Upon the performance of all obligations of all parties hereto, the School District shall release the Applicant from this Agreement, and the Applicant shall release the School District and the County from any and all future claims, costs or liabilities arising out of the provision of Proportionate Share Mitigation in accordance with this Agreement. These releases shall be recorded at the Applicant's expense in the Official Records of Hillsborough County, Florida, evidencing such performance.

(Doc. # 26 at 24; Doc. # 1-2 at ¶ 13).

Here, Defendants again ask the Court to consider matters outside the four corners of the complaint – namely, the parties' performance of the contracts. <u>See</u> (Doc. # 26 at 24 ("All parties have performed their obligations under the Development Agreement. Specifically, upon payment of the

proportionate share mitigation, the School Board revised its Certificate of School Concurrency to state that the level of service was met, it revised its 5-Year Work Plan to include the development and related construction, it applied the proportionate share mitigation toward[] school capacity improvement, and has already built the school improvement within the required 3 years."")); see also Moreno, 488 F. Supp. 3d at 1237 ("Waiver and release are more properly considered as affirmative defenses." (internal quotation marks and citation omitted)). And, the Court is not convinced that the simple fact that the parties negotiated the terms of the Development Agreement warrants dismissal at this stage.

Accordingly, the Court declines to dismiss the complaint for these reasons as well. As previously noted, the Court will be in a better position to consider these arguments when the factual record has been more fully developed at the summary judgment stage.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendants Hillsborough County and Hillsborough County School Board's Motion to Dismiss (Doc. # 26) is **DENIED.**

(2) Defendants' answers to the complaint (Doc. # 1) are due by **July 13, 2021.**

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this <u>29th</u> day of June, 2021.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE